IN the INTEREST OF HEZZIE R., a person Under the Age of 17:

STATE of Wisconsin, Petitioner-Appellant,

v.

HEZZIE R., Respondent-Respondent. [Case No. 97–0676]†

IN the INTEREST OF LUIS H., a person Under the Age of 17:

STATE of Wisconsin, Petitioner-Respondent,

v.

LUIS H., Respondent-Appellant. [Case No. 97–0686]†

IN the INTEREST OF RYAN D.L., a Person Under the Age of 17:

STATE of Wisconsin, Petitioner-Respondent,

v.

RYAN D.L., Respondent-Appellant. [Case No. 97–1109]†

Supreme Court

*Nos. 97–0676, 97–0685, 97–1109. Oral argument April 29, 1998.—Decided July 3, 1998.*

†Motion for reconsideration denied August 31, 1998. See per curiam issued August 31, 1998.

(Also reported in 580 N.W.2d 660.)

856

97–0676: For the petitioner-appellant the cause was argued by *Gregory M. Posner-Weber*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

For the respondent-respondent there was a brief by *Debra Flynn-Parrino*, assistant state public defender and *Stacy B. Walker,* assistant state public defender and oral argument by *Eileen A. Hirsch.*

97–0685: For the petitioner-respondent the cause was argued by *Gregory M. Posner-Weber*, assistant

attorney general, with whom on the brief was *James E. Doyle*, attorney general.

For the respondent-appellant there was a brief by *Michael Yovivich*, assistant state public defender and *Eileen A. Hirsch,* assistant state public defender and oral argument by *Eileen A. Hirsch.*

97–1109: For the petitioner-respondent the cause was argued by *Gregory M. Posner-Weber*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

For the respondent-appellant there was a brief by *Michael Yovivich*, assistant state public defender and *Eileen A. Hirsch,* assistant state public defender and oral argument by *Eileen A. Hirsch.*

¶ 1. N. PATRICK CROOKS, J. These consolidated cases are before the court[1] for determination of the constitutionality of the elimination of the right to trial by jury in juvenile delinquency cases under Wis. Stat. § 938.31(2)(1995–96).[2] Three juveniles contend that the elimination of a jury trial as part of a delin-

[1] No. 97–1109 is before the court on certification by the court of appeals, pursuant to Wis. Stat. § (Rule) 809.61, from an order of the Circuit Court for Clark County, James W. Rice, Judge. Nos. 97–0685 and 97–0676 arise on bypass of the court of appeals, pursuant to Wis. Stat. § (Rule) 809.60, from orders of the Circuit Court for Milwaukee County, Thomas P. Donegan, Judge.

Unless otherwise noted, all statutory references are to the 1995–96 volumes of the Wisconsin Statutes.

[2] Wisconsin Stat. § 938.31(2) indicates in pertinent part that in delinquency adjudications "[t]he hearing shall be to the court." Wisconsin Stat. § 48.31(2) (1993–94) had previously provided that "[t]he hearing shall be to the court unless the child, parent, guardian or legal custodian exercises the right to a jury

quency adjudication violates their state and federal constitutional rights.

¶ 2. We conclude that the provisions in the Juvenile Justice Code (JJC), Wis. Stat. ch. 938, that may subject a juvenile who has been adjudicated delinquent to placement in an adult prison are criminal in nature. Accordingly, the provisions in Wis. Stat. §§ 938.538(3)(a)1, 938.538(3)(a)1m, and 938.357(4)(d) which subject a juvenile to placement in an adult prison violate a juvenile's rights to a trial by jury under Article I, § 7 of the Wisconsin Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. Those provisions can and must be severed from the current JJC, consistent with precedent from this court and the Wisconsin Legislature's express intent to sever statutory provisions when necessary. The remaining non-criminal portions of Wis. Stat. ch. 938 are constitutional even absent the right to a trial by jury, since juveniles do not have a state or federal constitutional right to a trial by jury in the adjudicative phase of a juvenile delinquency proceeding.

I.

¶ 3. The facts and procedural history in the consolidated cases are undisputed. We address each in turn.

A. State v. Ryan D.L.

¶ 4. Ryan D.L. was 14 years old when the State initiated a juvenile petition in Clark County charging him with two counts of second degree sexual assault,

trial by demanding a jury trial at any time before or during the plea hearing."

actions contrary to Wis. Stat. § 940.225(2)(a). During the course of the delinquency adjudication, Ryan filed a request with the circuit court assigned to exercise jurisdiction under Wis. Stat. ch. 938 for a jury trial. Based on Wis. Stat. § 938.31(2) and this court's decision in *N.E. v. Wisconsin DHSS*, 122 Wis. 2d 198, 361 N.W.2d 693 (1985)(determining that juveniles have no constitutional right to a jury trial), the circuit court denied the motion and proceeded to find Ryan delinquent on both counts. The circuit court then entered a dispositional order placing Ryan at Lincoln Hills.

¶ 5. Ryan appealed the circuit court's denial of his request for a jury trial based on state and federal due process protections. We accepted certification from the court of appeals.

### B. State v. Hezzie R.

¶ 6. The State filed a juvenile petition against 14-year-old Hezzie R., charging him with first degree sexual assault of a child, contrary to Wis. Stat. § 948.02(1). Hezzie requested a jury trial, alleging that Wis. Stat. § 938.31(2) deprived him of due process. The State objected to his request. The circuit court assigned to exercise jurisdiction under Wis. Stat. ch. 938 reviewed the new JJC and determined that "[t]he procedures of the juvenile court have become more like criminal court proceedings. . . ." Finding it significant that an adjudication of delinquency would make Hezzie subject to placement in the JJC's Serious Juvenile Offender Program (SJOP), the circuit court determined that Wis. Stat. § 938.31(2) was unconstitutional as applied to Hezzie and that he was entitled to a jury based on due process considerations.

¶ 7. At the State's request, the court stayed further proceedings pending appeal of that determination.

Upon our acceptance of the certification in *Ryan L.*, the State asked for and received bypass of the court of appeals in *Hezzie*.

## C. State v. Luis H.

¶ 8. Luis H. was 13 years old when the State initiated delinquency proceedings charging him with first degree sexual assault of a child, in violation of Wis. Stat. § 948.02(1). Prior to any adjudication of delinquency, Luis filed an objection to the court's failure to provide him with a jury trial. The case was then consolidated with *Hezzie R.*.

¶ 9. The same circuit court that determined that Hezzie's due process rights would be violated since he would be subject to placement in the SJOP determined that Wis. Stat. § 938.31(2) was not unconstitutional on its face and that Luis's due process rights would not be violated by the absence of a jury trial. The court reached its disparate determinations in *Hezzie* and *Luis H.* based on its conclusion that while the punitive aspects of the SJOP required a jury determination of delinquency in Hezzie's case, juveniles like Luis not potentially subject to placement in the SJOP were not entitled to a jury.[3]

¶ 10. Luis then pursued a permissive appeal under Wis. Stat. § 808.03(2), and the circuit court stayed further proceedings pending his appeal. This court accepted the case on bypass and consolidated it with the two other matters.

---

[3] While Luis and Hezzie were charged with violating the same crime, Luis's age precluded the circuit court from placing him in the SJOP. *See* Wis. Stat. § 938.34(4h)(a).

## II.

¶ 11. A thorough discussion of the appropriate standard of review by this court is essential. This court reviews challenges to the constitutionality of a statute de novo. *See State v. Hall*, 207 Wis. 2d 54, 67, 557 N.W.2d 778 (1997)(citing *State v. McManus*, 152 Wis. 2d 113, 129, 447 N.W.2d 654 (1989)). Statutes are presumed to be constitutional; therefore, "every presumption must be indulged to uphold the law if at all possible." *Norquist v. Zeuske*, 211 Wis. 2d 241, 250, 564 N.W.2d 748 (1997)(citing *Gottlieb v. City of Milwaukee*, 33 Wis. 2d 408, 415, 147 N.W.2d 633 (1967); *see also State ex rel. Fort Howard Paper Co. v. State Lake Dist. Bd. of Review*, 82 Wis. 2d 491, 505, 263 N.W.2d 178 (1978)("The cardinal rule of statutory construction is to preserve a statute and find it constitutional if it is at all possible to do so.").

> It is an elementary principle of law in this state that this court will search for a means to sustain a statute and will not infer or go out of its way to find means with which to condemn a statute adopted by the legislature. In fact, this court has in the past and will continue to sustain the constitutionality of a statute if any facts can be reasonably conceived which will support its constitutionality. Thus, the burden of establishing the unconstitutionality of a statute is on the person attacking it, who must overcome the strong presumption in favor of its validity.

*White House Milk Co. v. Reynolds*, 12 Wis. 2d 143, 150–51, 106 N.W.2d 441 (1960).

██

¶ 12. Due to this strong presumption of constitutionality, a party challenging a statute bears the heavy

burden of proving that the statute is unconstitutional beyond a reasonable doubt. *See City of Milwaukee v. Kilgore*, 193 Wis. 2d 168, 188, 532 N.W.2d 690 (1995). "If any doubt exists, it must be resolved in favor of the constitutionality of a statute." *State v. Starks*, 51 Wis. 2d 256, 259, 186 N.W.2d 245 (1971)(citing *State ex rel. Thomson v. Giessel*, 265 Wis. 558, 564, 61 N.W.2d 903 (1953)); *see also Powell v. Pennsylvania*, 127 U.S. 678, 684 (1888) ("Every possible presumption. . .is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt.") (quoting *United Pac. R.R. Co. v. United States*, 99 U.S. 700, 718 (1878)).

¶ 13. In reviewing the constitutionality of a statute, a court may find only a portion of a particular statute unconstitutional, allowing the remaining valid portions of that statute to continue in effect:

> It is well understood that part of a statute may be unconstitutional, and the remainder may still have effect, provided the two parts are distinct and separable and are not dependent upon each other. It is only where the void part of a statute was evidently designed as compensation for or an inducement to the otherwise valid portion, so that it must be presumed that the legislature would not have passed one portion without the other, that the whole statute must be held void.

*Muench v. Public Serv. Comm'n*, 261 Wis. 492, 515, 55 N.W.2d 40 (1952)(quoting *Quiggle v. Herman*, 131 Wis. 379, 382, 111 N.W. 479 (1907)).

¶ 14. This test for severability has been consistently applied in Wisconsin:

The factors to consider in deciding whether a statute should be severed from an invalid provision are the intent of the legislature and the viability of the severed portion standing alone. *Chicago & North Western Transportation Co. v. Pedersen*, 80 Wis. 2d 566, 575, 259 N.W.2d 316 (1977). Invalid provisions of a statute may not be severed when it appears from the act that the legislature intended the statute to be effective only as an entirety and would not have enacted the valid part by itself. *Madison v. Nickel*, 66 Wis. 2d 71, 79, 223 N.W.2d 865 (1974).

*Burlington Northern v. Superior*, 131 Wis. 2d 564, 580–81, 388 N.W.2d 916 (1986); *see also State ex rel. Briggs & Stratton v. Noll*, 100 Wis. 2d 650, 660, 302 N.W.2d 487 (1981); *Bence v. Milwaukee*, 84 Wis. 2d 224, 233–34, 267 N.W.2d 25 (1978); *Chicago & N.W. Transp. Co. v. Pedersen*, 80 Wis. 2d 566, 259 N.W.2d 316 (1977); *City of Madison v. Nickel*, 66 Wis. 2d 71, 79, 223 N.W.2d 865 (1974). The test for severability has also been recognized by other state and federal courts, as well as legal commentators:

[T]he Supreme Court, the state courts, and secondary authorities all appear to agree that the invalidity of part of a law or of some of its applications will not affect the remainder (1) if the valid provisions or applications are capable of being given legal effect standing alone, and (2) if the legislature would have intended them to stand with the invalid provisions stricken out.

Robert Stern, *Separability and Separability Clauses in the Supreme Court*, 51 Harv. L. Rev. 76, 76 (1937).

¶ 15. The question is whether the invalid portion of the statute "so infect[ed] the remainder of the legislation as to require the entire law to be invalidated[—]a

question of legislative intent." *Bence*, 84 Wis. 2d at 234 (citations omitted).

> [I]f the purpose of a statute is to accomplish a single object only and some of its provisions are unconstitutional and void, the whole must fail, unless sufficient remains to effect the object without the aid of the invalid portions. On the other hand, if sufficient remains to effect the object of the statute without the aid of the invalid portion, the latter only should be rejected. . . .

*Nickel*, 66 Wis. 2d at 79 (quoting 16 Am.Jur.2d, *Constitutional Law*, pp. 414, 415, § 186).

¶ 16. In addition to the principles of severance stated in our case law, "[t]he legislature can create a clear statement rule by enacting a general severability clause providing that all statutes should be treated as severable. . . ." John Copeland Nagle, *Severability*, 72 N.C. L. Rev. 203, 256 (1993). The Wisconsin Legislature has done just that by explicitly stating that where a court can sever an unconstitutional portion of any statute, the court is required to do so, as long as the remaining statutory provisions can stand independent of the severed portion. Wisconsin Stat. § 990.001(11) provides:

> SEVERABILITY. The provisions of the statutes are severable. The provisions of any session law are severable. If any provision of the statutes or of a session law is invalid, or if the application of either to any person or circumstance is invalid, such invalidity shall not affect other provisions or applications which can be given effect without the invalid provision or application.

¶ 17. Determining whether portions of a statute are severable requires an analysis of legislative intent, which is a question of law. *See Burlington Northern*, 131 Wis. 2d at 580. As with any statutory interpretation, a reviewing court must first look to the language of the statute. *See id.* If the statutory language is ambiguous, a court must turn to extrinsic aids such as the legislative history, scope, context, subject matter and object of the statute to determine legislative intent. *See id.*

## III.

¶ 18. Before addressing the constitutional challenges to the provisions of the JJC in this case, and determining whether it is necessary and appropriate to sever any provisions of the JJC, it is important to lay the foundation of controlling precedent from the United States Supreme Court and this court addressing juveniles' assertions of a right to a jury trial.

¶ 19. In *McKeiver v. Pennsylvania*, 403 U.S. 528, 530 (1971), the United States Supreme Court considered the issue whether the Pennsylvania Legislature's failure to provide juveniles with the right to a trial by jury in the adjudicative phase of a delinquency proceeding violated the United States Constitution. The United States Supreme Court surveyed its previous case law in relation to juveniles' rights, reasoning that:

> [s]ome of the constitutional requirements attendant upon the state criminal trial have equal application to that part of the state juvenile proceeding that is adjudicative in nature. Among these are the rights to appropriate notice, to counsel, to confrontation and to cross-examination, and the privilege against

self-incrimination. Included, also, is the standard of proof beyond a reasonable doubt.

*Id.* at 533.

¶ 20. Notwithstanding the fact that many constitutional protections extend to juveniles, the Supreme Court determined that juvenile delinquency adjudication proceedings are not criminal proceedings within the context of the Sixth Amendment to the United States Constitution. Therefore, the failure to provide juveniles with the right to a jury trial in such proceedings did not violate a juvenile's federal due process rights. Thus, the *McKeiver* Court ultimately concluded that "trial by jury in the juvenile court's adjudicative stage *is not a constitutional requirement.*" *Id.* at 545 (emphasis supplied). Rather, if a state legislature chooses to afford juveniles jury trial rights, it "is the State's privilege and not its obligation." *Id.* at 547.

¶ 21. The plurality opinion in *McKeiver* cited 13 separate reasons for its decision. Specifically, the Supreme Court determined that (1) all constitutional rights afforded criminally accused adults need not be imposed in a juvenile adjudication proceeding, *see id*; (2) providing juveniles with a jury trial would "remake" the juvenile adjudication proceeding into a full adversary proceeding, *see id*; (3) the Task Force Report submitted to the Pennsylvania Legislature did not recommend affording jury trial rights to juveniles and recommended against returning juveniles to criminal courts, *see id.* at 545–46; (4) a jury is not necessarily an essential part of a fair and equitable proceeding, even in the context of some criminal cases, *see id.* at 547; (5) jury trial rights may restrict a juvenile court's "ability to function in a unique manner," *id*; (6) states should be allowed to experiment with juvenile proceedings to accomplish rehabilitation goals, *see id.*; (7) denying

juveniles the right to jury trials is a function of a lack of resources rather than "inherent unfairness," *id.* at 548; (8) a juvenile court judge has the discretion to impanel an advisory jury, *see id*; (9) a majority of state legislatures denied juveniles the right to a jury trial, *see id.*; (10) of the states denying juvenile jury trial rights, several had concluded that United States Supreme Court precedent did not compel such rights, *see id.* at 549; (11) federal acts did not propose juvenile jury trial rights, *see id.* at 549–50; (12) jury trials would bring delays and formalities to juvenile delinquency adjudication proceedings, *see id.* at 550; and (13) the juvenile court system contemplates aspects "of fairness, of concern, of sympathy, and of paternal attention" that are not present in criminal proceedings. *See id.*

¶ 22. Fourteen years after *McKeiver* was decided, this court decided *N.E.*, 122 Wis. 2d 198. At the time *N.E.* was decided, the Wisconsin Statutes afforded a juvenile the right to request a jury trial. *See* Wis. Stat. § 48.31(2) (1983–84). The issue presented in *N.E.* was distinct from that in *McKeiver*, and raised the question of whether a court commissioner erred in accepting the withdrawal of a juvenile's request for a jury trial. *See N.E.*, 122 Wis. 2d at 199. N.E.'s primary argument, however, was that a juvenile has a constitutional right to a trial by jury under Article I, § 5 and the due process clause of Article I, § 1 of the Wisconsin Constitution. *See id.* at 202.

¶ 23. In addressing N.E.'s argument, this court determined that the rights preserved in Wis. Const. art. I, § 5 are only those rights that existed at the time the Wisconsin Constitution was adopted in 1848. *See id.* at 203 (citing *Upper Lakes Shipping v. Seafarers' I. Union*, 23 Wis. 2d 494, 503, 128 N.W.2d 73 (1964)). Because juvenile delinquency proceedings did not exist

in 1848, this court reasoned, "no right to a jury trial in delinquency proceedings could have been preserved." *N.E.*, 122 Wis. 2d at 203 (citations omitted).

¶ 24. This court also rejected N.E.'s due process argument. *See id.* at 203–4. In doing so, it relied upon precedent from the Wisconsin Supreme Court in *State v. Scholl*, 167 Wis. 504, 167 N.W. 830 (1918)(concluding juvenile delinquency proceedings are not akin to criminal proceedings), and *Wisconsin Indus. School for Girls v. Clark County*, 103 Wis. 651, 79 N.W. 422 (1899)(same). In summary, this court concluded that "a juvenile's right to a jury trial is *neither a federal nor a state constitutional right and is strictly a statutory, non-fundamental right.*" *N.E.*, 122 Wis. 2d at 201 (emphasis supplied).

## IV.

¶ 25. With the presumption of constitutionality, the severability case law and statute, precedent of the United States Supreme Court, and precedent from this court as our foundation, we next consider the constitutional challenges of the juveniles. Collectively, the juveniles in this case argue that the lack of the right to a jury trial in the adjudicative phase of delinquency proceedings under the JJC violates the following state and federal constitutional provisions: (1) Article I, § 7 of the Wisconsin Constitution; (2) the Sixth Amendment to the United States Constitution as applied through the Fourteenth Amendment; (3) Article I, § 5 of the Wisconsin Constitution; (4) the due process clause of Article I, § 1 of the Wisconsin Constitution; (5) the due process clause of Article I, § 8 of the Wisconsin Constitution; (6) the due process clause of the Fifth Amendment to the United States Constitution as applied through the Fourteenth Amendment; (7) the

869

equal protection clause of Article I, § 1 of the Wisconsin Constitution; and (8) the equal protection clause of the Fourteenth Amendment to the United States Constitution. We will address each of these constitutional challenges in turn, consolidating the juveniles' arguments where appropriate.

### A. ARTICLE I, SECTION 7 OF THE WISCONSIN CONSTITUTION AND THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

¶ 26. The juveniles first argue that the JJC violates art. I, § 7 of the Wisconsin Constitution, which states:

> In all criminal prosecutions the accused shall enjoy the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face; to have compulsory process to compel the attendance of witnesses in his behalf; and in prosecutions by indictment or information, to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed; which county or district shall have been previously ascertained by law.

Similarly, the juveniles argue that the Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, is violated. The Sixth Amendment states in relevant part:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law. . . .

Thus, the right to a jury trial under Wis. Const. art. I, § 7 and the Sixth Amendment extends to any individual who is subject to a criminal prosecution.

¶ 27. The juveniles in this case contend that, because the newly enacted JJC is essentially a criminal code, the protections afforded criminally accused individuals under Wis. Const. art. I, § 7, and the Sixth and Fourteenth Amendments, apply to them. They argue that the JJC is distinct from the statutory juvenile delinquency provisions at issue in *McKeiver* and *N.E.* Therefore, they contend, the United States Supreme Court's decision in *McKeiver*, and this court's decision in *N.E.*, are inapplicable in this case. Accordingly, a discussion of the history behind the adoption of the JJC is warranted.

¶ 28. In 1994, the Wisconsin Legislature passed legislation approved by the governor which created the Juvenile Justice Study Committee (JJSC). *See* 1994 Wisconsin Act 377. The JJSC was created to examine the then-existing Children's Code codified in Wis. Stat. ch. 48, and recommend suggestions for change in Wisconsin's legislation in response to increasing juvenile crime. *See* Juvenile Justice Study Committee, *Juvenile Justice: A Wisconsin Blueprint for Change* 2 (January, 1995)(JJSC Report).

¶ 29. In its final report to the legislature, the JJSC recommended several changes. Although the JJSC continued to recognize "the importance of rehabilitation of young people who violate the law," *JJSC Report* at 10, the JJSC determined that the legislature should take a more balanced approach to juvenile delinquency, adding personal accountability and community protection to the legislature's primary objectives, in addition to the rehabilitation of juveniles.

*See id.* at 6. This approach was advocated as a means to "best serve[ ] both the offender and society." *Id.* at 10.[4]

¶ 30. As part of the JJSC's balanced approach philosophy, the JJSC endorsed the removal of the juvenile delinquency proceeding provisions from Wis. Stat. ch. 48 to another statutory chapter, under a new title. *See id.* at 9. The JJSC recommended that the newly titled Juvenile Justice Code be placed at Wis. Stat. ch. 938, next to the criminal code. The JJSC did "not suggest that the newly created Juvenile Justice code be made part of the Criminal Code." *Id.* at 11. Rather, the JJSC explained that the statutory placement was recommended for symbolic reasons, to "provide incentives for young offenders to change their behavior." *Id.*[5]

¶ 31. The JJSC also recommended that the express legislative intent and purpose codified in the JJC should incorporate and promote the goals of balancing rehabilitation, accountability, and protection of the public. *See id.* at 10. The JJSC suggested, and the legislature and the governor ultimately agreed, that such matters as the protection of citizens and holding juveniles accountable for their acts be added to the express purposes of the statute. *See id.; see also* Wis. Stat. § 938.01. The JJSC also suggested, and again the

---

[4] We disagree with the dissent's repeated assertions that consideration of the victims' rights and protection of the public are objectives that are new to the JJC, Wis. Stat. ch. 938. In the old juvenile code, Wis. Stat. ch. 48 (1993–94), the legislature recognized several times in its statement of legislative purpose, the goals of protecting victims' rights and "public safety." *See* Wis. Stat. §§ 48.01(1)(a), (d), (h); 48.01(2).

[5] The dissent fails to recognize these statements of the JJSC—the study committee created by the legislature and the governor to recommend changes to the then-existing statutory provisions governing juvenile delinquency proceedings.

legislature and the governor agreed, that the express intent of the legislature in the JJC should include provisions assuring that a child is provided a fair hearing, enforcing the constitutional rights of the juvenile, allowing for an individual assessment of each juvenile's needs, developing a child's ability to live as a productive and responsible member of the community, diverting juveniles from the JJC through early intervention if possible, and responding to a child's needs for care and treatment in accordance with his or her best interests. *See JJSC Report* at 10; Wis. Stat. § 938.01.

¶ 32. As part of several substantive changes made in regard to juvenile delinquency proceedings, the Wisconsin Legislature adopted the JJSC's suggestion to eliminate a juvenile's then-existing statutory right to a jury trial under Wis. Stat. ch. 48. In recommending the elimination of this statutory right, the JJSC relied upon this court's decision in *N.E.*, 122 Wis. 2d at 201, that a juvenile's right to a jury trial is a statutory non-fundamental right, and that juveniles do not have a state or federal constitutional right to trial by jury. *See JJSC Report* at 20. The JJSC also recognized that "Wisconsin is one of just a few states that permit jury trials in [juvenile] matters." *Id.*

¶ 33. Although the legislature subsequently enacted the JJC to incorporate a new balanced approach in juvenile delinquency proceedings, the legislature did not lose sight of the fact that the JJC provisions are distinct from the criminal code provisions, and that the rehabilitation of juveniles is a primary objective. The substantive provisions in the JJC provide several indicia of this focus. For example, an intake worker may enter a deferred prosecution agreement to avoid delinquency proceedings, if it is in the best interests of the juvenile and the public. *See*

Wis. Stat. § 938.245. Similarly, in accord with Wis. Stat. § 938.21(7), a judge or juvenile court commissioner has the discretion to dismiss a petition and refer a juvenile's case to a social worker for deferred prosecution, if it is in "the best interests of the juvenile and the public." A juvenile court judge also has the discretion to suspend a delinquency proceeding at any time prior to the entry of judgment and place a juvenile under supervision in the juvenile's own home or in a youth village program. *See* Wis. Stat. § 938.32(1)(a).[6] Under Wis. Stat. § 938.235(1) the court may appoint a guardian ad litem to represent the best interests of a juvenile if that juvenile is placed outside of his or her home due to a need for protection or services, or a change in placement.

¶ 34. Under the JJC, a juvenile is also afforded numerous procedural and fundamental rights. For example, under Wis. Stat. § 938.243(1)(ag)–(c), an intake worker must inform a juvenile that a petition for an adjudication of delinquency may be filed, what the allegations in the petition will likely be, and the potential consequences resulting from the proceeding. The intake worker must also inform the juvenile of his or her right to remain silent, right to confront and cross-examine witnesses, right to counsel, and right to present and subpoena witnesses. *See* Wis. Stat. § 938.243(1)(d)–(f). Further, the juvenile is informed of

---

[6] The provisions of the JJC that allow for a suspension or deferment of prosecution to avoid delinquency proceedings are consistent with the purpose of the old juvenile code "[t]o divert children from the juvenile justice system to the extent this is consistent with the protection of children and the public safety." Wis. Stat. § 48.01(1)(d) (1993–94).

the applicable burden of proof the State must overcome. *See* Wis. Stat. § 938.243(1)(h).[7]

¶ 35. Before a dispositional order is entered for a juvenile adjudicated delinquent, a report must be submitted to the court addressing a juvenile's individual needs. The report must include a "recommended plan of rehabilitation or treatment and care for the juvenile" and a "description of the specific services or continuum of services" needed for the child and his or her family. Wis. Stat. § 938.33(1)(b), (c). The report must also include a list of the "academic, social and vocational skills needed by the juvenile," and a "plan for the provision of educational services to the juvenile." Wis. Stat. § 938.33(1)(d), (e). In addition, the report must include any necessary recommendations for "mental health treatment, anger management, [and] individual or family counseling or parent training and education." Wis. Stat. § 938.33(1)(f).

¶ 36. When making an appropriate dispositional order, the juvenile court judge has a myriad of alternatives that may be used, including counseling, supervision, probation programs, teen court programs, electronic monitoring, a variety of placement alternatives, alcohol and drug treatment, educational and

---

[7] Wisconsin Stat. § 938.243(1)(h) states that a juvenile has:

> the right to have the allegations of the petition proved by clear and convincing evidence unless the juvenile comes within the court's jurisdiction under s. 938.12 or 938.13(12), in which case the standard of proof shall be beyond a reasonable doubt.

Wisconsin Stat. §§ 938.12 and 938.13(12) respectively set forth jurisdiction over juveniles alleged to be delinquent and juveniles alleged to be in need of protection or services who have committed a delinquent act. Thus, in accord with Wis. Stat. § 938.243(1)(h), the allegations in a petition for an adjudication of delinquency must be proved beyond a reasonable doubt.

vocational programs, day treatment programs, community service, and victim-offender mediation. *See* Wis. Stat. § 938.34.

¶ 37. If a provision of the dispositional order includes placement of the juvenile in a foster home, treatment foster home, group home, child caring institution, secure detention facility or shelter care facility, a "permanency plan" must be prepared to "ensure that a juvenile is reunified with his or her family whenever possible, or that the juvenile quickly attains a placement or home providing long-term stability." Wis. Stat. § 938.38(1). The goals of the permanency plan include "ensur[ing] proper care and treatment of the juvenile," "meet[ing] the juvenile's physical, emotional, social, educational and vocation needs," and "improv[ing] the conditions of the parents' home to facilitate the return of the juvenile. . ." Wis. Stat. § 938.38(4)(f). Transfer of legal custody of a juvenile from his or her parents to a relative, the county, or a licensed child welfare agency only occurs where "it is shown that the rehabilitation or the treatment and care of the juvenile cannot be accomplished by means of voluntary consent of the parent or guardian." Wis. Stat. § 938.34(4).

¶ 38. The legislature did not express an intent that an adjudication of delinquency be treated as a criminal conviction. In fact, the JJC includes explicit legislative language to the contrary:

> A judgment in a [juvenile delinquency] proceeding on a petition under this subchapter is not a conviction of a crime, does not impose any civil disabilities ordinarily resulting from the conviction of a crime and does not operate to disqualify the juvenile in any civil service application or appointment.

Wis. Stat. § 938.35(1).

¶ 39. Notwithstanding these provisions in the JJC, the juveniles in this case premise their constitutional challenges on the assertion that the JJC is not a juvenile code but is, for all intents and purposes, a "criminal code." Because the juvenile proceedings are therefore akin to a criminal prosecution that may impose criminal punishment, they argue, their right to a jury trial is guaranteed under Wis. Const. art. I, § 7 and the Sixth and Fourteenth Amendments. To support their argument, the juveniles assert that under certain specific provisions in the JJC, a juvenile is potentially subject to: (1) a possible lifetime commitment as a sexually violent individual under Wis. Stat. ch. 980; (2) a possible need to register as a sex offender; (3) a possible lifetime ban on the possession of a firearm; (4) an adjudication of delinquency being considered in any future adult sentencing; (5) an adjudication of delinquency being considered for future impeachment proceedings and in future bail hearings; (6) the possibility of several years of placement in a juvenile secured correctional facility; and (7) a possible transfer from a juvenile secured correctional facility to an adult prison.

██

¶ 40. The juveniles are correct in their contention that a juvenile adjudicated delinquent for a sexually violent offense may be subject to civil commitment as a sexually violent person. *See* Wis. Stat. § 980.01(7). What the juveniles fail to recognize is that the proceedings under Wis. Stat. ch. 980 are separate proceedings for which an individual is entitled to a jury trial. Under Wis. Stat. § 980.02(1), the State must file a petition alleging that an individual is a sexually violent person. The petition must not only allege that the individual has been convicted, or adjudicated delinquent, based

877

on a sexually violent offense,[8] but must also allege that the individual has a mental disorder and that the "mental disorder creates a substantial probability that he or she will engage in acts of sexual violence." Wis. Stat. § 980.02(2).[9] Among the rights afforded an individual subject to ch. 980 is the right to request a trial by a jury of 12 persons. *See* Wis. Stat. § 980.03(3). Thus, the denial of a juvenile's right to a jury trial at the delinquency proceeding does not result in potential commitment under ch. 980 without the right to a jury trial.

¶ 41. Moreover, this court has previously concluded that a commitment under Wis. Stat. ch. 980 is not criminal punishment, but that ch. 980 is remedial in nature and furthers the goals of treatment of sexually violent persons and protection of the public. *See State v. Carpenter*, 197 Wis. 2d 252, 541 N.W.2d 105 (1995); *State v. Post*, 197 Wis. 2d 279, 541 N.W.2d 115

---

[8] A petition may also be filed where the subject of the petition "has been found not guilty of a sexually violent offense by reason of mental disease or defect." Wis. Stat. § 980.02(2)(a)3.

[9] The dissent argues that "[t]he majority fails to acknowledge that a 'sexually violent person' is defined as 'a person who has been. . .adjudicated delinquent for a sexually violent offense. . . .' " This reading of the definitional section of Wis. Stat. ch. 980 seems to state that once a juvenile is adjudicated delinquent for a sexually violent offense, he or she may automatically be committed as a sexually violent person. The dissent ignores the *entire* definition of a sexually violent person under Wis. Stat. § 980.01(7) which states:

> "Sexually violent person" means a person who has been. . .adjudicated delinquent for a sexually violent offense. . . *and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence.*

(1995). In *Carpenter*, 197 Wis. 2d at 259, this court concluded that "ch. 980 does not violate either the Ex Post Facto or the Double Jeopardy Clause[s]" of the Wisconsin or United States Constitutions. In *Post*, 197 Wis. 2d at 293–94, this court concluded that ch. 980 "violates neither the substantive due process nor the equal protection guarantees of the United States and Wisconsin constitutions."

¶ 42. Although the statutory provisions and constitutional challenges differ in this case, *Post* and *Carpenter* are enlightening to the extent that they each considered whether the effect of Wis. Stat. ch. 980 was essentially criminal punishment notwithstanding the legislature's intent to treat sexually violent persons. This court recognized that "[o]ur task is not to search for sinister ulterior motives underlying the legislature's acts in order to find statutes unconstitutional," *Carpenter*, 197 Wis. 2d at 268, and that "we presume good faith on the part of the legislature," *Post*, 197 Wis. 2d at 308.

¶ 43. Applying these standards of review, this court looked to the treatment procedures and objectives in Wis. Stat. ch. 980 and concluded that commitment under ch. 980 is not criminal in nature, even though there may be some punitive aspects to the statute. This court reasoned that the goals of the legislature in treating sexually violent persons and attempting to protect the public were not outweighed by any seemingly punitive nature of ch. 980. This court expressly rejected the argument that ch. 980 is punitive because persons subject to ch. 980 received some procedural safeguards akin to criminal proceedings. *See Carpenter*, 197 Wis. 2d at 252. This court also rejected the argument that the legislature's punitive intent was evident from the placement of the statute in

the criminal code. *See id.* Thus, several of the arguments rejected in *Post* and *Carpenter* are arguments that we also reject in this case in concluding that, like ch. 980, the JJC does not impose punishment and is not criminal in nature.

¶ 44. The juveniles also argue that an adjudication of delinquency for a sexually motivated offense may result in having to comply with the reporting requirements for sex offender registration under Wis. Stat. § 301.45. The juveniles fail to recognize that those reporting requirements may be waived. Under Wis. Stat. § 938.34(15m)(bm) (1997–98),[10] a juvenile need not comply with the reporting requirements of § 301.45 if "the court determines, after a hearing on a motion made by the juvenile, that the juvenile is not required to comply under s. 301.45(1m)." Factors that a juvenile court may consider in determining whether to waive the reporting requirements include:

1. The ages, at the time of the violation, of the juvenile and the victim of the violation.
2. The relationship between the juvenile and the victim of the violation.
3. Whether the violation resulted in bodily harm, as defined in s. 939.22(4), to the victim.
4. Whether the victim suffered from a mental illness or mental deficiency that rendered him or her temporarily or permanently incapable of understanding or evaluating the consequences of his or her actions.
5. The probability that the juvenile will commit other violations in the future.

---

[10] This legislation was enacted on April 17, 1998, as 1997 Wisconsin Act 130, and went into effect on May 2, 1998.

 6. Any other factor that the court determines may be relevant to particular case.

Wis. Stat. § 938.34(15m)(c). The requirements of § 301.45, therefore, are only imposed on a juvenile who is adjudicated delinquent where the particular facts of the case and concerns for public safety dictate it. This is not criminal punishment and does not equate the JJC to a criminal code.

¶ 45. The juveniles next argue that an adjudication of delinquency for a crime that would be a felony if committed by an adult subjects a juvenile to a lifetime ban on the possession of firearms, just like adults with felony convictions. They are correct that a juvenile is potentially subject to a ban on the possession of firearms in accord with Wis. Stat. § 941.29(1)(bm). However, § 941.29 does not apply to juveniles in the same manner that it applies to adults. The ban on firearm possession does not apply to any juvenile adjudicated delinquent "if a court subsequently determines that the [juvenile] is not likely to act in a manner dangerous to public safety." Wis. Stat. § 941.29(8). The juvenile has the burden only of showing "by a preponderance of the evidence that he or she is not likely to act in a manner dangerous to public safety." *Id.* Based upon this language, it is evident that the legislature intended to restrict firearm possession of a juvenile adjudicated delinquent only where public safety is at risk.[11] The application of § 941.29 under the JJC is not

---

[11] This requirement that a juvenile must show that his or her possession of a firearm would not likely present a danger to the public does not rise to the level of proving the "absence of any proclivity to commit a bad act," as the dissent contends. Dissenting op. at 916 n.13.

criminal punishment and does not transform the JJC into a criminal code.

¶ 46. The juveniles assert that the JJC is a criminal code because an adjudication of delinquency may be considered in future sentences upon conviction for adult misdemeanor and felony crimes. They are accurate in stating that a criminal court may consider an adjudication of delinquency in sentencing proceedings for a misdemeanor or felony conviction. However, the former juvenile delinquency adjudication may be considered "only for the purpose of a presentence study and report." Wis. Stat. § 938.35(1)(a). Moreover, adjudications of delinquency, and even juvenile contacts with the court system that do not result in adjudications of delinquency, have been considered by sentencing judges in adult criminal proceedings long before the JJC was created and juvenile delinquency procedures amended. *See, e.g., State v. Harris*, 119 Wis. 2d 612, 624, 350 N.W.2d 633 (1984)("The factors considered by the trial court [including juvenile contacts, *see Harris*, 119 Wis. 2d at 621] prior to the imposition of sentence were proper."). Allowing a court to consider adjudications of delinquency in an attempt to understand the nature and background of an offender and impose an appropriate sentence is not criminal punishment.

¶ 47. As the juveniles argue, evidence of an adjudication of delinquency may be used "[f]or the purpose of attacking the credibility of a witness." Wis. Stat. §§ 938.35(1)(cm), 906.09. However, before a court may admit the prior adjudication, it must make a determination, in accord with Wis. Stat. § 901.04, if the evidence should be excluded because "its probative

value is substantially outweighed by the danger of unfair prejudice." Wis. Stat. § 906.09(2), (3). Allowing a juvenile delinquency adjudication to be considered on the issue of credibility in future proceedings furthers the interests of justice. It is not criminal punishment and does not render the JJC a criminal code.

■■

¶ 48. The juveniles in this case further contend that the JJC is a criminal code because an adjudication of delinquency may be a factor considered in setting bail and conditions of release in future criminal proceedings under Wis. Stat. ch. 969. We agree that it is a consideration; yet, it is only one of numerous factors a court may consider:

> Proper considerations in determining whether to release the defendant without bail, fixing a reasonable amount of bail or imposing other reasonable conditions of release are: the ability of the arrested person to give bail, the nature, number and gravity of the offenses and the potential penalty the defendant faces, whether the alleged acts were violent in nature, the defendant's prior record of criminal convictions and delinquency adjudications, if any, the character, health, residence and reputation of the defendant, the character and strength of the evidence which has been presented to the judge, whether the defendant is currently on probation or parole, whether the defendant is already on bail or subject to other release conditions in other pending cases, whether the defendant has been bound over for trial after a preliminary examination, whether the defendant has in the past forfeited bail or violated a condition of release or was a fugitive from justice at the time of arrest, and the policy against unnecessary detention of the defendant's [sic] pending trial.

Wis. Stat. § 969.01(4). In addition, the purpose of bail is not to punish a defendant, but is imposed "only in the amount necessary to assure the appearance of the defendant." *Id.* Including a delinquency adjudication in those factors to be considered to ensure a defendant's appearance in future court proceedings is not criminal punishment and does not render the JJC criminal in nature.

¶ 49. The juveniles maintain that the potential disposition of long periods of placement in a juvenile secured correctional facility imposes punishment equivalent to confinement under the criminal code, particularly under the SJOP provisions in the JJC. *See* Wis. Stat. § 938.538. The juveniles argue that they may be placed in a secured facility for several years, even until the age of 25.

██

¶ 50. The dispositional alternatives available to a juvenile court judge are numerous, and many do not include placement outside the juvenile's home. However, as stated, if a juvenile is placed in a foster home, treatment foster home, group home, child caring institution, secure detention facility or shelter care facility, a permanency plan must be prepared, keeping in mind the primary goals of stability and reunification of a juvenile with his or her family. *See* Wis. Stat. § 938.38(1)(b). Placement in a juvenile secured correctional facility is an option available to the juvenile court judge, subject to certain criteria. For example, a juvenile under the age of 12 may not be placed in a juvenile secured correctional facility unless he or she has been adjudicated delinquent for an act which would be punishable by a sentence of six months or more if committed by an adult, and if the juvenile is "found to be a danger to the public and to be in need of

restrictive custodial treatment." Wis. Stat. § 938.34(4m). In any event, any placement in a child caring institution, or a Type 1 or Type 2 secured correctional facility is placement in a facility that solely houses juveniles. The juveniles are not housed with adult criminals. The distinctions between juvenile placement and adult criminal placement are maintained, allowing the focus of juvenile treatment and rehabilitation to remain intact. Moreover, the provisions that may subject a juvenile to placement in a secured juvenile correctional facility, potentially until the age of 25, are provisions that existed in the old juvenile code. *See* Wis. Stat. §§ 48.34(4m); 48.357(4), (5)(e); 48.366 (1993–94). Placement in a juvenile facility is not criminal punishment and does not convert the JJC into a criminal code.

¶ 51. Finally, the juveniles argue that the provisions of the JJC that potentially subject them to transfer to an adult prison are criminal in nature. Under the SJOP, a juvenile 17 years of age or over may be placed in a Type 1 prison as defined in Wis. Stat. § 301.01(5). *See* Wis. Stat. § 938.538(3)(a)1., 1m. Similarly, under Wis. Stat. § 938.357(4)(d)(1997–98),[12] a juvenile 15 years of age or over who is placed in a Type 1 juvenile secured correctional facility may be transferred to the Racine Youthful Offender Correctional Facility[13] if the juvenile "presents a serious problem to the juvenile or others." Each of these provisions provide that a juvenile adjudicated delinquent may be housed with adult criminal offenders in adult state prisons. Courts in other jurisdictions have determined

[12] All references to Wis. Stat. § 938.357(4)(d) are to the 1997–98 volume of the Wisconsin Statutes.

[13] The Racine Youthful Correctional Facility is a medium security state prison. *See* Wis. Stat. § 302.01.

that this type of placement subjects a juvenile to criminal punishment, and we agree.

¶ 52. In *In re C.B.*, 708 So. 2d 391, 392 (La. 1998), the Louisiana Supreme Court addressed a Louisiana statute which authorized "the Department of Public Safety and Corrections to promulgate a regulation requiring juveniles who have been adjudicated delinquent (not convicted of a crime) to be transferred to adult facilities upon reaching the age of seventeen." Initially, the Louisiana Supreme Court recognized that Louisiana's Children's Code granted juveniles in delinquency proceedings "essentially all rights guaranteed to criminal defendants by the federal and state constitutions, except the right to trial by jury." *Id.* at 396. The Court also recognized that although the focus of the Children's Code was rehabilitation and treatment, not restitution, subjecting juveniles to placement in adult prisons resulted in "punitive incarceration." *Id.*

¶ 53. The Louisiana Supreme Court noted that transfer of juveniles to "adult penal institutions" represented the Louisiana Legislature's "wholesale reversal of one hundred years of state policy wherein adjudicated juvenile delinquents have been treated in a noncriminal fashion." *Id.* at 399. The Court acknowledged the United States Supreme Court's decision in *McKeiver*, 403 U.S. 508, but rejected its application based upon the criminal nature of the placement in adult prisons at issue in *In re C.B.. Id.* at 398. Accordingly, in concluding that the juveniles' constitutional rights had been violated, the Louisiana Supreme Court reasoned that the juveniles were essentially receiving a "de facto criminal sentence. . .without being afforded the right to trial by jury as is mandated by [Louisiana's] state constitution." *Id.* at 395.

¶ 54. Similarly, we conclude that the provisions in Wis. Stat. §§ 938.538(3)(a)1, 938.538(3)(a)1m, and 938.357(4)(d), providing for transfer of juveniles to adult prisons, result in a "de facto criminal sentence." *Id.* Juveniles transferred under these provisions are subject to placement in the exact environment to which adults with criminal convictions are subject. In addition, those juveniles are subject to being housed with the general population of criminally convicted adults. However, the juveniles subject to placement in adult prisons are not afforded the right to a trial by jury, unlike the adult offenders.

¶ 55. Due to the potential placement in an adult prison under Wis. Stat. §§ 938.538(3)(a)1, 938.538(3)(a)1m, and 938.357(4)(d), we conclude that those provisions in the JJC violate Article I, § 7 of the Wisconsin Constitution and the Sixth and Fourteenth Amendments to the United States Constitution because they essentially subject a juvenile to the consequences of a "criminal prosecution" without the right to a trial by jury. The juveniles have overcome the presumption of constitutionality, and have proved beyond a reasonable doubt that those provisions are unconstitutional. *See Kilgore*, 193 Wis. 2d at 188. Accordingly, we must consider whether those three provisions may be severed from the JJC. *See Burlington Northern*, 131 Wis. 2d at 580–81. To that end, we must determine whether severance would be consistent with the legislature's intent and whether the remaining provisions of the JJC are viable independent of the severed portions. *See id.* If the purposes and objectives of the JJC may be effected "without the aid of the invalid portion,"

the invalid provisions should be severed.[14] *Nickel,* 66 Wis. 2d at 78–79.

¶ 56. There is no express legislative intent regarding severability or inseverability in the JJC. However, as previously stated, the Wisconsin Statutes do contain a general severance statute, which states "[i]f any provision of the statutes. . .is invalid. . .such invalidity shall not affect other provisions. . .which can be given effect without the invalid provision." Wis. Stat. § 990.001(11). We conclude that the purposes and objectives of the JJC can be fully met even if the provisions in Wis. Stat. §§ 938.538(3)(a)1, 938.538(3)(a)1m, and 938.357(4)(d), allowing for juvenile transfer to adult prisons are severed.

¶ 57. The legislative intent and purpose in enacting the JJC are set forth in Wis. Stat. § 938.01. Those

---

[14] With absolutely no citation to authority, the dissent contends that "while severance may be appropriate for a due process analysis, its application in an art. I, § 7 framework is inappropriate." Dissenting op. at 904. No authority could be found stating that an appellate court's responsibility to sever portions of a statute—consistent with precedent from this court and the legislature's intent—is inapplicable in a Wis. Const. art. I, § 7 analysis. Similarly, no authority could be found for the dissent's statement that a "Wis. Const. art. I, § 7 inquiry has two prongs." Dissenting op. at 907.

The dissent also argues that our "focus on isolating three penal provisions only serves to obfuscate the real inquiry" which, the dissent contends, is "whether the JJC by its purpose and effect is so criminal in nature as to invoke art. I, § 7 protections." Dissenting op. at 907. We fail to see how our discussion of the specific provisions of the JJC confuses the issue, particularly where the juveniles' argument is premised almost entirely upon the assertion that the specific provisions of the JJC are criminal in nature. We cannot consider the purpose and effect of the JJC as a whole without addressing its individual provisions.

express statements of legislative intent reflect a desire to balance the rehabilitative needs for care and treatment of each juvenile, with holding the juvenile accountable for his or her acts, and protecting the public. *See JJSC Report* at 10; Wis. Stat. § 938.01. This balanced approach was adopted with the best interests of the juvenile and of society as the foundation. *See id.* We have no doubt that these goals may be achieved absent the provisions allowing for transfer of juveniles to adult prisons. Severance is beneficial to the juveniles as it recognizes their right to a jury trial where the proceedings are criminal in nature and result in criminal consequences. Severance does not interfere with the need to protect society because, if necessary under the particular circumstances, a juvenile may still be placed in a secured juvenile correctional facility. *See* Wis. Stat. § 938.34(4m). Further, severing the provisions allowing for transfer to an adult prison in Wis. Stat. §§ 938.538(3)(a)1, 938.538(3)(a)1m, and 938.357(4)(d), in no way inhibits the function of the remaining portions of the JJC. It merely eliminates one type of dispositional option[15] or transfer from numerous others available to a juvenile court judge.

¶ 58. Absent the provisions in Wis. Stat. §§ 938.538(3)(a)1, 938.538(3)(a)1m, and 938.357(4)(d), we conclude that the JJC is not a criminal code. As such, the United States Supreme Court precedent in *McKeiver*, and this court's precedent in *N.E.*, remain

---

[15] Under Wis. Stat. § 938.538(3)(a)1 and 1m as they currently exist, a juvenile court judge has the discretion to order that a juvenile who is subject to the Serious Juvenile Offender Program and is age 17 or over be placed in a Type 1 prison, as defined in Wis. Stat. § 301.01(5).

controlling.[16] In both cases, the courts concluded that juvenile delinquency proceedings are not criminal proceedings. Therefore, with the severance of Wis. Stat. §§ 938.538(3)(a)1, 938.538(3)(a)1m, and 938.357(4)(d), we conclude there is no violation of Wis. Const. art. I, § 7, or the Sixth and Fourteenth Amendments, for failure to provide juveniles with a trial by jury under Wis. Stat. ch. 938.

## B. ARTICLE I, SECTION 5 OF THE WISCONSIN CONSTITUTION

¶ 59. The juveniles next argue that the JJC violates art. I, § 5 of the Wisconsin Constitution, which states:

> The right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy; but a jury trial may be waived by the parties in all cases in the manner prescribed by law. Provided, however, that the legislature may, from time to time, by statute provide that a valid verdict, in civil cases, may be based on the votes of a specified number of the jury, not less than five-sixths thereof.

[16] The dissent argues that our reliance on this court's decision in *N.E. v. Wisconsin DHSS*, 122 Wis. 2d 198, 361 N.W.2d 693 (1985), is unjustified because "[t]he *N.E.* court did not consider art. I, § 7." Dissenting op. at 899. However, the *N.E.* court did consider the application of Wis. Const. art. I, § 5, which also addresses the right to a jury trial. *N.E.*, 122 Wis. 2d at 203. The *N.E.* court concluded that "[j]uvenile delinquency proceedings did not exist at the time the constitution was adopted and thus, no right to a jury trial in delinquency proceedings could have been preserved." *Id.*

A thorough discussion of Wis. Const. art. I, § 5 is unnecessary since we have already determined that this court's holding in *N.E.* is controlling, given the noncriminal nature of the JJC once Wis. Stat. §§ 938.538(3)(a)1, 938.538(3)(a)1m, and 938.357(4)(d), are severed. In *N.E.*, this court concluded that art. I, § 5 of the Wisconsin Constitution did not preserve the right to a jury trial in juvenile delinquency proceedings. *See N.E.*, 122 Wis. 2d at 203. Thus, there is no violation of Wis. Const. art. I, § 5 in this case.

## C. DUE PROCESS UNDER ARTICLE I, § 1 AND ARTICLE I, § 8 OF THE WISCONSIN CONSTITUTION AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

■■■

¶ 60. The juveniles in this case argue that the lack of the right to a jury trial in the JJC violates their due process rights under the Wisconsin and United States Constitutions. This court has repeatedly stated that the due process clauses of the state and federal constitutions are essentially equivalent and are subject to identical interpretation. *See Reginald D. v. State*, 193 Wis. 2d 299, 307, 533 N.W.2d 181 (1995).

¶ 61. The United States Supreme Court has on several occasions discussed the procedural process due juveniles in delinquency proceedings. *See, e.g., Kent v. United States*, 383 U.S. 541 (1966); *Gallegos v. Colorado*, 370 U.S. 49 (1962); *Haley v. Ohio*, 332 U.S. 596 (1948). In *In re Gault*, 387 U.S. 1 (1967), the Supreme Court addressed the due process challenges of a 15-year old individual subject to the Arizona Juvenile Code. The Court ultimately concluded that a juvenile's due process rights include the right to counsel, *see id.*

at 41, the right to remain silent, *see id.* at 55, the right to confront and cross-examine witnesses, *see id.* at 57, the right to written notice, *see id.* at 33–34, and the right to sworn testimony, *see id.* at 56.

¶ 62. As discussed in part III of this opinion, the United States Supreme Court addressed the issue of a juvenile's right to trial by jury in *McKeiver*, 403 U.S. 528. The Supreme Court considered the nature of juvenile proceedings and concluded that juvenile delinquency proceedings are not criminal proceedings. Therefore, the due process clause of the United States Constitution does not guarantee juveniles the right to a trial by jury. *See id.* at 545. The decision in *McKeiver* was followed in *N.E.*, where this court similarly concluded that the due process clause of the Wisconsin Constitution does not guarantee juveniles the right to a jury trial because delinquency proceedings are not criminal in nature.

¶ 63. Although *McKeiver* and *N.E.* conclude that a juvenile does not have a constitutional right to a jury trial, that does not mean that a juvenile is not afforded a fair trial when a petition for an adjudication of delinquency has been filed. Thus, procedural due process requirements are satisfied when the juvenile delinquency proceeding under Wis. Stat. ch. 938 is tried before a "neutral and detached" juvenile court judge. *Cf. Morrissey v. Brewer*, 408 U.S. 471, 489 (1972).

¶ 64. Based upon our conclusion that the provisions in Wis. Stat. §§ 938.538(3)(a)1, 938.538(3)(a)1m, and 938.357(4)(d) may be severed, and that the remaining provisions in the JJC are non-criminal, we conclude that once those provisions are severed, there clearly is no violation of the juvenile's state or federal constitu-

tional due process protections. *See McKeiver*, 403 U.S. at 545; *N.E.*, 122 Wis. 2d at 201.

## D. EQUAL PROTECTION UNDER ARTICLE I, § 1 OF THE WISCONSIN CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

¶ 65. The juveniles' final argument is that the denial of the right to a jury trial violates the equal protection clauses of the Wisconsin and United States Constitutions. They argue that they are denied equal protection under Wis. Stat. ch. 938 because juveniles and adults subject to Wis. Stats. chs. 48, 51, 55 and 980 are entitled to a jury trial.[17]

¶ 66. This court has previously concluded that the equal protection clauses of the Wisconsin and United States Constitutions are equivalent for purposes of interpretation. *See Reginald D.*, 193 Wis. 2d at 307. Equal protection requires that there exist reasonable and practical grounds for the classifications created by the legislature. *See id.* at 308. In *State v. McManus*, 152 Wis. 2d 113, 131, 447 N.W.2d 654 (1989) this court stated:

> Equal protection does not deny a state the power to treat persons within its jurisdiction differently; rather, the state retains broad discretion to create classifications so long as the classifications have a reasonable basis. The fact a statutory classification results in some inequity. . .does not provide suffi-

---

[17] Wisconsin Stat. ch. 48 is the Children's Code, Wis. Stat. ch. 51 is the Mental Health Act, Wis. Stat. ch. 55 is the Protective Service System, and Wis. Stat. ch. 980 governs Sexually Violent Person Commitments.

cient grounds for invalidating a legislative enactment. Where. . .a suspect classification is not alleged, the legislative enactment "must be sustained unless it is 'patently arbitrary' and bears no rational relationship to a legitimate government interest." "If the classification is reasonable and practical in relation to the objective, that is sufficient and doubts must be resolved in favor of the reasonableness of the classification."

(Internal citations omitted.)

¶ 67. Where a suspect class or a fundamental right is involved, a reviewing court must apply a level of scrutiny more strict than the rational basis test. Under the strict scrutiny test, the State must prove that the classification is necessary to promote a "compelling governmental interest" in order to withstand the constitutional challenge. *State v. Post*, 197 Wis. 2d 279, 319, 541 N.W.2d 115 (1995).

¶ 68. In *N.E.*, 122 Wis. 2d at 207, this court concluded that a juvenile's then-existing statutory right to a jury trial was a non-fundamental right. In addition, the juveniles in this case do not argue that they are members of a suspect class. Moreover, courts in other jurisdictions have previously determined that juveniles are not a suspect class for purposes of an equal protection analysis. *See, e.g., State v. Stackhouse*, 947 P.2d 777, 780 (Wash. Ct. App. 1997). Therefore, the appropriate standard of review in this case is to consider whether the legislature had a rational basis for eliminating juveniles' statutory right to a jury trial.

¶ 69. Where our inquiry is whether a rational basis exists for the legislature's classification, it is our "obligation to locate or to construct, if possible, a rationale that might have influenced the legislature and

894

that reasonably upholds the legislative determination." *Tomczak v. Bailey*, 218 Wis. 2d 245, 264, 578 N.W.2d 166 (1998) (quoting *Sambs v. City of Brookfield*, 97 Wis. 2d 356, 371, 293 N.W.2d 504 (1980)). Our analysis of the legislature's classification "requires only that [we] locate some reasonable basis for the classification made." *Tomczak*, 218 Wis. 2d at 269 n.14 (quoting *Omernik v. State*, 64 Wis. 2d 6, 19, 218 N.W.2d 734 (1974)). We conclude that a reasonable basis exists in this case.

¶ 70. In enacting the JJC, the JJSC and the legislature expressed concerns about negating delays in the juvenile justice system. The JJSC recommended that "[t]he system should operate more efficiently through *streamlining of processes* and improved access to information by entities that work with juvenile delinquents." *JJSC Report* at 7 (emphasis supplied). This concern is also evidenced in Wis. Stat. § 938.01(2)(e), which states that one of the purposes of the JJC is "[t]o divert juveniles from the juvenile justice system through *early intervention. . .*" (Emphasis supplied.)

¶ 71. This desire for immediate intervention bears a "reasonable and practical" relationship to the legislature's desire to rehabilitate and treat juvenile offenders and protect the public. *McManus*, 152 Wis. 2d at 131. Similar language is not found in Wis. Stat. chs. 48, 51, 55, and 980. The distinct nature of juvenile delinquency proceedings and the objectives of the legislature evince that there is a "rational basis" for attempting to streamline the proceedings by not affording juveniles the right to a jury trial.

¶ 72. The objectives of the Wisconsin Legislature for immediate intervention were objectives recognized by the United States Supreme Court in *McKeiver*, 403

U.S. at 550, when the Court stated that, if a jury trial "were injected into the juvenile court system as a matter of right, it would bring with it into that system the traditional delay, the formality and the clamor of the adversary system." The objectives of the Wisconsin Legislature in relation to the JJC are also similar to those noted by the Colorado Supreme Court:

> The juvenile system is premised on the concept that a more informal, simple, and speedy judicial setting will best serve the needs and welfare of juvenile defendants. . . . A separate juvenile system was formed to delay placement of juveniles into the formal machinery of the judicial system.

*J.T. v. O'Rourke*, 651 P.2d 407, 412 n.5 (Colo. 1982).

¶ 73. It is this court's responsibility to attempt to locate a rationale for the legislature's classification that "reasonably upholds the legislative determination." *Id.*, at 264. Based upon the legislature's stated objectives in the JJC, and other persuasive authority cited herein, we conclude that the need for early intervention in the JJC is a reasonable basis for requiring that the trier of fact in a juvenile delinquency proceeding be the juvenile court judge. Accordingly, we conclude that the juveniles' rights guaranteed under the equal protection clauses of the Wisconsin and United States Constitutions have not been violated.

## V.

¶ 74. In summary, we conclude that the provisions in Wis. Stat. ch. 938 that may subject a juvenile who has been adjudicated delinquent to placement in an adult prison are criminal in nature. Accordingly, the provisions in Wis. Stat. §§ 938.538(3)(a)1,

938.538(3)(a)1m, and 938.357(4)(d) which subject a juvenile to placement in an adult prison violate a juvenile's rights to a trial by jury under Article I, § 7 of the Wisconsin Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. Those provisions can and must be severed from the current JJC. Severing those provisions in Wis. Stat. §§ 938.538(3)(a)1, 938.538(3)(a)1m, and 938.357(4)(d) is in accord with precedent from this court, *see Burlington Northern*, 131 Wis. 2d 564, and the Wisconsin Legislature's express intent to sever statutory provisions, *see* Wis. Stat. § 990.001(11). Moreover, our conclusion that the remaining non-criminal portions of the JJC are constitutional even absent the right to a trial by jury is consistent with the United States Supreme Court's decision in *McKeiver* and this court's decision in *N.E.*. It is also consistent with a majority of the states in the union which have determined that juveniles do not have a state or federal constitutional right to a trial by jury in the adjudicative phase of a juvenile delinquency proceeding.[18] Accordingly, the

---

[18]*See* ALA. CODE § 12–15–65(a) (1995); ALASKA STAT. § 47.10.070 (Michie 1996); ARK. CODE ANN. § 9–27–325 (Michie 1998); CONN. GEN. STAT. § 54–76e (1997); DEL. CODE ANN. tit. 10 § 1009 (Supp. 1996); D.C. CODE ANN. §§ 16–2316, 16–2327 (1981); FLA. STAT. ch. 985.228 (1997); GA. CODE ANN. § 15–11–28(a) (Supp. 1997); HAW. REV. STAT. § 571–41(a) (1993 & Supp. 1997); IND. CODE § 31–32–6–7 (Supp. 1997); IOWA CODE § 232.47 (1997); KY. REV. STAT. ANN. § 610.070(1) (Michie Supp. 1996); ME. REV. STAT. ANN. tit. 15, § 3310(1) (West Supp. 1997); MD. CODE ANN., CTS. & JUD. PROC. § 3–812(f) (Supp. 1997); MINN. STAT. § 260.155, subd. 1 (1996 & Supp. 1997); MISS. CODE ANN. § 43–21–203(3) (1993); MO. REV. STAT. § 211.171 (Supp. 1997); NEB. REV. STAT. § 43–279(1) (1993); NEV. REV. STAT. ANN. § 62.193 (Michie Supp. 1997); N.H. REV. STAT. ANN.

orders of the circuit court in *Ryan D.L.* and *Luis H.* are affirmed, while the order of the circuit court in *Hezzie R.* is reversed.

*By the Court.*—In *State v. Ryan D.L.*, order affirmed. In *State v. Hezzie R.*, order reversed and cause remanded. In *State v. Luis H.*, order affirmed and cause remanded.

¶ 75. ANN WALSH BRADLEY, J. (*dissenting*). All of the parties, even the State, concede that in this case severance cannot resolve a constitutional challenge under art. I, § 7 of the Wisconsin constitution. Yet, undeterred by such a concession, the majority advances a manipulated focus which allows it to arrive at its constitutional conclusion.

¶ 76. The focus of a Wis. Const. art. I, § 7 inquiry cannot be merely whether three plainly penal provisions of the Juvenile Justice Code (JJC) can be severed. Such a focus on isolating three penal provisions only serves to obfuscate the real inquiry. The proper focus is to view the JJC in its entirety and the real question is whether the JJC by its purpose and effect is so criminal in nature as to invoke art. I, § 7 protections.

¶ 77. After reviewing the JJC under art. I, § 7, I conclude that in moving the JJC from Chapter 48 (the

§ 169-B:16 (1994 & Supp. 1997); N.J. STAT. ANN. § 2A:4A–40 (West 1987); N.Y. JUD. LAW § 342.1 (McKinney 1983); N.C. GEN. STAT. § 7A–631 (1995); N.D. CENT. CODE § 27–20–24 (1) (1991); OHIO REV. CODE ANN. § 2151.35(A) (Anderson Supp. 1997); OR. REV. STAT. § 419B.310 (1997); 42 PA. CONS. STAT. § 6336(a) (1995); S.C. CODE ANN. § 20–7–755 (Law. Co-op Supp. 1997); TENN. CODE ANN. § 37–1–124(a) (1996); UTAH CODE ANN. § 78–3A–115 (Supp. 1997); VT. STAT. ANN. tit. 33, § 5523(a) (1991 & Supp. 1997); WASH. REV. CODE § 13.04.021(2) (1996).

Children's Code) to Chapter 938 (adjoining the criminal code), the legislature intended more than to merely move the statute 890 chapters from the first volume to the last volume of the Wisconsin Statutes. The move instead signaled a change in direction from the unbalanced approach of the Children's Code, which has the paramount purpose of promoting the "best interests of the child" to a balanced approach akin to the criminal code, which balances rehabilitative interests along with protection of the public and accountability of the offender. Because the majority's analysis has no continuing basis in the law or in the facts of juvenile delinquency adjudications today, I dissent from the majority's conclusion that juveniles have no right to a jury trial under art. I, § 7 of the Wisconsin constitution.

## I.

¶ 78. The State concedes that aspects of the new JJC track individual aspects of the criminal code. It also concedes that the move puts the "new system [ ] closer to a criminal proceeding than it used to be." In moving the juvenile delinquency provisions and changing the JJC's purposes, dispositions, and long-term consequences to more closely resemble the criminal code, while at the same time eliminating the right to a jury trial, I conclude that the legislature's enactment of the JJC crosses over the constitutional line.

¶ 79. Article I, § 7 of the Wisconsin constitution declares that "[i]n all criminal prosecutions the accused shall enjoy the right. . .to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed. . . ." By its terms, the constitutional protections inherent in art. I, § 7 apply only to those proceedings deemed "criminal" in nature. The juveniles claim that the JJC is criminal

in nature in that it treats juvenile offenders in a manner sufficiently similar to adult criminal offenders as to invoke this constitutional protection. The juveniles accordingly assert that Wis. Stat. § 938.31(2)'s[1] proclamation that juvenile delinquency adjudications shall be "to the court" is unconstitutional.

¶ 80. The question of whether youthful offenders are entitled to jury hearings is one that courts have faced since the creation of a separate juvenile justice system and is one still receiving prominent consideration today. *See, e.g., In re C.B.*, 708 So. 2d 391 (La. 1998); *State v. Schaaf*, 743 P.2d 240 (Wash. 1987). It is a question that this court under different prior juvenile laws has faced and answered in the negative a number of times. *See N.E. v. DHSS*, 122 Wis. 2d 198, 361 N.W.2d 693 (1985)("*In Interest of N.E.*"); *State v. Scholl*, 167 Wis. 504, 167 N.W. 830 (1918); *Wisconsin Industrial School for Girls v. Clark County*, 103 Wis. 651, 79 N.W. 422 (1899).[2]

---

[1] Unless otherwise noted, all statutory references are to the 1995–96 volumes.

[2] There is a long history of providing juveniles with a jury trial in Wisconsin. At common law illegal acts committed by juveniles were prosecuted as crimes and the accused was entitled to a jury trial. *See In re Gault*, 387 U.S. 1, 16 (1966). When Wisconsin created its juvenile courts in 1901, felonies were excluded from the new court's jurisdiction so that juveniles facing incarceration continued to receive a jury trial. In 1925, when the juvenile court's reach was extended, the jury trial right was offered by statute to all juveniles, *see* Wis. Stat. § 48.31(2) (1993–94), and lasted until it was eliminated by 1995 Wis. Act 77. While the legislative history does not conclusively indicate the reason for the change, the chairperson of the Juvenile Justice Study Committee (Study Committee) has indicated that the right was eliminated because jury trials "are expensive for counties to administer, and their use often has been as a 'bar-

¶ 81. The juvenile justice system has historically been focused solely on nurturing and rehabilitating youthful offenders while removing the taint that accompanies a criminal conviction in adult court. *See* Janet E. Ainsworth, *Re-Imagining Childhood and Reconstructing the Legal Order: The Case for Abolishing the Juvenile Court*, 69 N.C. L. Rev. 1083, 1096–97 (1991). As this court noted in *Scholl*:

> It is sufficient to say on this point that the proceedings under this law are in no sense criminal proceedings, nor is the result in any case a conviction or punishment for crime. They are simply statutory proceedings by which the state. . .reaches out its arms in a kindly way and provides for the protection of its children. . . .

*Scholl*, 167 Wis. at 509. This unbalanced and "kindly" focus on the child, often termed "parens patriae,"[3] has kept juvenile codes in the past from being labeled "criminal" proceedings. *See, e.g., McKeiver v. Pennsylvania*, 403 U.S. 528 (1971).

¶ 82. However, in 1995 the balance changed markedly. The Wisconsin legislature reacted to the recommendations of the Juvenile Justice Study Committee (the Study Committee) by crafting a comprehensive overhaul of Wisconsin's juvenile justice system, in the form of Wis. Stat. ch. 938. *See* 1995 Wis.

---

gaining chip' in negotiating plea agreements. . . ." Dennis J. Barry, *Juvenile Justice: A Wisconsin Blueprint For Change*, Wisconsin Lawyer, Mar. 1995 at 31.

[3] Black's Law Dictionary 1114 (6th ed. 1990) defines "parens patriae" as:

> [L]iterally "parent of the country," refers traditionally to role of state as sovereign and guardian of persons under legal disability, such as juveniles or the insane. . . .

Act 77. In taking this action, the legislature not only made "symbolic" alterations to the old Children's Code, Wis. Stat. ch. 48 (1993–94), the legislature also made significant substantive modifications to the manner in which juveniles alleged delinquent are treated. As the Study Committee Report indicated:

> The [JJC] will significantly change the way Wisconsin treats young lawbreakers. Personal accountability and community protection will join offender rehabilitation as the primary objectives of Wisconsin's juvenile justice system. Such a balanced approach is the most effective way to respond to juvenile crime.

Juvenile Justice Study Committee, *Juvenile Justice: A Wisconsin Blueprint for Change* (1995)[hereinafter "Report"].

¶ 83. In making these modifications and adjusting the balance of purposes underlying the juvenile justice system, the legislature once again presents this court with the question of whether the juvenile code has crossed the constitutional line from an acceptable "parens patriae" system of juvenile social rehabilitation to what is effectively a separate system of criminal prosecution of "young lawbreakers." If the JJC is the former, additional procedural protections need not be applied by the court. If the latter, juveniles may legitimately invoke the constitutional protections of art. I, § 7 of the Wisconsin constitution.

## II.

¶ 84. As an initial matter, I note that the majority declares four "foundations" for its ultimate constitutional conclusion—our standard of review, the rule of severance, and state and federal case law. As for

the first foundation, standard of review, I agree with the majority that the appropriate standard of review is de novo, with the juveniles bearing the burden of proving the presumptively constitutional JJC unconstitutional beyond a reasonable doubt. *See State v. Hall*, 207 Wis. 2d 54, 67, 557 N.W.2d 778 (1997); *State v. McManus*, 152 Wis. 2d 113, 129, 447 N.W.2d 654 (1989). The majority's lengthy citation and quotation of precedent for this general principle notwithstanding, the basic presumption is simply the starting point of our analysis, not our conclusion. It does not significantly buttress the majority's failure to accurately address the juveniles' arguments.

¶ 85. The majority's second declared foundation, the rule of severability, is even more problematic. It allows the majority to obfuscate the proper analysis under Wis. Const. art. I, § 7 and declare "[a]bsent the provisions in Wis. Stat. §§ 938.538(3)(a)1, 938.538(3)(a)1m and 938.357(4)(d). . .the JJC is not a criminal code." The problem with relying on the rule of severability in a case of this nature, even putting aside the concessions of the parties, is that art. I, § 7 is concerned with proceedings which are criminal in nature, not particular sanctions which are punitive. The mere removal of one potential sanction cannot change the expressed focus and real effect of the JJC. Thus, while severance may be appropriate for a due process analysis, its application in an art. I, § 7 framework is inappropriate.[4]

---

[4] None of the parties in their briefs or at oral argument considered or argued that severance is available under an art. I, § 7 analysis. Both parties acknowledge that under art. I, § 7, the focus is on the nature or character of the proceedings—not as the majority alone asserts on three penal provisions. Respondent-appellant's supplemental brief at 16, 16–28; Petitioner-

¶ 86. Finally, I note that as further foundations for its opinion the majority also repeatedly returns for support to this court's decision in *N.E.* and the 1971 decision of the United States Supreme Court in *McKeiver*. This reliance is unjustified.

¶ 87. In *N.E.* this court determined that "a juvenile's right to a jury trial is neither a federal nor a state constitutional right." *N.E.*, 122 Wis. 2d at 201. The court made that statement based on our review of the then-existing parens patriae juvenile code—a juvenile code which no longer exists. The *N.E.* court did not even consider Wis. Const. art. I, § 7, likely because the emphasis of the old Children's Code was significantly different from the JJC.

¶ 88. Similarly, the high court in *McKeiver* examined a Pennsylvania juvenile law and concluded that there was no federal due process right to a jury trial. In reaching this conclusion the Court repeatedly cited the failures of the parens patriae system of juvenile justice, but noted that:

> [t]he Court, however, has not *yet* said that all rights constitutionally assured to an adult accused of crime also are to be enforced or made available to the juvenile . . .[and] the juvenile court proceeding has not *yet* been held to be a "criminal prosecution". . .and also has not *yet* been regarded as devoid of criminal aspects merely because it usually has been given the civil label.

respondent's brief-in-chief at 10. At oral argument both parties concede that severance is not an available option. In response to a severance question, counsel for the juveniles stated that although severance may be an option under a due process analysis, it is not available in an art. I, § 7 challenge. In response to a similar question, the State also acknowledged it could not be done here.

*McKeiver*, 403 U.S. at 533, 541 (emphasis added). The Court then concluded that "[i]f the formalities of the criminal adjudicative process are to be superimposed upon the juvenile court system, there is little need for its separate existence. Perhaps the ultimate disillusionment will come one day, but for the moment we are disinclined to give impetus to it." *Id.* at 551.

¶ 89. The operative philosophy of the juvenile justice system in Wisconsin has been modified in a substantial and material fashion since *N.E.* and *McKeiver* were decided. To blindly rely on those precedents, which go not to whether the JJC is sufficiently criminal to invoke the protections of the art. I, § 7 of the Wisconsin constitution, but rather to fundamental fairness challenges to parens patriae juvenile laws which no longer exist is to ignore the real constitutional challenge before the court. The "day" referred to by *McKeiver* has arrived. Because *McKeiver* and *N.E.* are reliant upon juvenile codes not at issue here, it is incumbent upon this court to examine the JJC from a perspective unjaundiced by prior constitutional conclusions derived from different juvenile codes.

### III.

¶ 90. In this case the State uniformly asserts that the JJC, including the Serious Juvenile Offender Program, is a rehabilitation and treatment based system of juvenile oversight not intended by the legislature to be a juvenile criminal code for punishing youthful offenders. The juveniles respond that the JJC demonstrates all of the characteristics of a criminal code, including an intent to punish. In considering these diametrically opposed positions under the state constitution, the dispositive inquiry is not whether the accused is a child or whether the proceedings are before

a court labeled "juvenile." Rather, the inquiry is whether the proceedings at hand may be fairly characterized in purpose and effect as being "criminal" in nature.

¶ 91. Like the related inquiry used to determine whether a statute is civil or punitive, *see, e.g., Kansas v. Hendricks*, 117 S. Ct. 2072, 2082 (1997), the Wis. Const. art. I, § 7 inquiry has two prongs. First, the stated intention of the legislature must be examined. Second, a determination must be made as to whether the code's purposes and effects are so criminal in nature as to defeat the legislature's separation of the juvenile code from the protections inherent in the adult criminal code. Upon review of the structure, expressed purposes, and substantive provisions of the JJC, I conclude that not only has the JJC shifted treatment of juvenile offenders in Wisconsin "closer to" the criminal sphere, it has dramatically crossed the constitutional line invoking art. I, § 7 of the Wisconsin constitution.

¶ 92. In adopting a new juvenile code, the Juvenile Justice Code, the legislature intended a substantive reorientation of the law as it affects children who have committed acts which, if they were adults, would subject them to criminal sanction. This intention is readily apparent from the changes in placement and expressed legislative purpose accomplished through the enactment of the JJC. As one commentary notes, "[t]he enactment of Chapter 938 marked a clear change in the way Wisconsin views its children. By situating the new Juvenile Justice Code immediately before the Criminal Code (ch. 939–951), the legislature signaled its intent to treat young offenders. . .more like adult criminals under the Criminal Code." Virginia A. Pomeroy & Gina M. Pruski, *Wiscon-*

*sin Juvenile Law Handbook* 1–1 (1998).[5] Indeed, as the Study Committee indicated, the JJC has been rebalanced to address young "law violators who often are physically and mentally mature and who have demonstrated a willingness to engage in serious and even heinous acts." Report at 9.

¶ 93. The Study Committee further stated that:

Both codes [the JJC and the Criminal Code] deal with the same kinds of behavior, even though there are distinctions in the ages of the perpetrators and the potential dispositions available. Young offenders would be reminded that while society does not yet classify their actions as criminal, they are "almost there."

Report at 11.

¶ 94. In examining the expressed legislative purpose provisions in the new code, I note the contrasts between it and the prior code. The old Children's Code, Wis. Stat. ch. 48 (1993–94), formerly indicated that the legislature's intent with respect to juvenile delinquents was:

---

[5] As the Chairperson and a member of the Study Committee have indicated:

The creation of Chapter 938 for delinquents underscores the differences between child victims of circumstances outside of their control and young people who choose to violate laws. While sometimes there is a relationship between the two categories, Chapter 938 recognizes the illogic in using basically the same philosophical and procedural system to deal with both classifications of young people. Thus, the new legislation creates a separate chapter in the statutes to deal exclusively with young lawbreakers.

Dennis J. Barry & Bonnie Ladwig, *Time Ripe for Change*, Wisconsin Lawyer, Apr. 1996 at 13.

(c) Consistent with the protection of the public interest, to remove from children committing delinquent acts the consequences of criminal behavior and to substitute therefor a program of supervision, care and rehabilitation.

(d) To divert children from the juvenile justice system to the extent this is consistent with the protection of children and the public safety.

. . .

Wis. Stat. § 48.01(1)(c)–(d)(1993–94). These provisions were to be liberally construed to promote the "best interests" of the child while also considering the child's parents and the public at large. *See* Wis. Stat. § 48.01(2)(1993–94).

¶ 95. The legislative purpose indicated above is, however, in marked contrast to the expressed legislative purpose of the new JJC as it was amended and recreated at Wis. Stat. § 938.01. While the expressed legislative purpose of the JJC continues to include some intervention for the benefit of the juvenile, in Wis. Stat. § 938.01 the legislature expressly stated a change in focus to include the illegal act committed by the juvenile, protection of the public from the illegal behavior of the juvenile, and the imposition of personal accountability on the juvenile offender.

¶ 96. The applicable legislative intent and purpose section of the JJC provides in pertinent part that:

(2) It is the intent of the legislature to promote a juvenile justice system capable of dealing with the problem of juvenile delinquency, a system which will *protect the community, impose accountability* for violations of law and equip juvenile offenders with competencies to live responsibly and productively. To effectuate this intent, the legislature

declares the following to be equally important purposes of this chapter:

(a) To *protect citizens* from *juvenile crime.*

(b) To hold each juvenile offender directly *accountable* for his or her acts.

(c) To provide an individualized assessment of each alleged and adjudicated delinquent juvenile, *in order to prevent further delinquent behavior* through the development of competency in the juvenile offender. . . .

(e) To divert juveniles from the juvenile justice system through early intervention as warranted, when *consistent with the protection of the public.* . . .

(g) To ensure that victims and witnesses of acts committed by juveniles that result in proceedings under this chapter are, consistent with the provisions of this chapter and the Wisconsin constitution, afforded *the same rights as victims and witnesses of crimes committed by adults.* . . .

Wis. Stat. § 938.01 (emphasis added).[6]

¶ 97. As these sections illustrate, the JJC was intended not only to assist juvenile offenders in becoming more productive members of society, it was also designed to hold "juvenile offenders" "accountable" for the "crimes" committed against "victims," and thereby ensure the "protection of the public." Wis. Stat. § 938.01.

---

[6] The majority attempts to avoid recognition of this significant change in language and emphasis between the JJC and old Children's Code. *See* Majority op. at 873 n.5. Interestingly, the majority references neither the "crime" language indicated above, nor the "personal accountability," i.e., "punishment," provisions of Wis. Stat ch. 938. The majority does not, because it cannot do so and still reach its result.

¶ 98. From the provisions quoted above, it is apparent that the legislature intended to focus not primarily on rehabilitation, as in the old Children's Code, but also on punishment of the juvenile offender and protection of the community. Such a balance of purposes is inconsistent with the old parens patriae theory of juvenile justice. The State cannot "reach[ ] out its arms in a kindly way and provide[ ] for the protection of its children," while also attempting to protect the public from and hold the offenders accountable for their law violating behavior. *See Scholl*, 167 Wis. at 509.

¶ 99. Such a balanced approach is, however, consistent with the approach of the adult criminal system, i.e., protection of the public, accountability for the offense, and the rehabilitative needs of the adult offender. *See McCleary v. State*, 49 Wis. 2d 263, 271, 182 N.W.2d 512 (1971); *State v. McMaster*, 198 Wis. 2d 542, 551, 543 N.W.2d 499 (Ct. App. 1995), *aff'd* 206 Wis. 2d 30, 506 N.W.2d 673 (1996). Thus, while the JJC may retain some effort to rehabilitate the juvenile offender for the juvenile offender's sake, that goal combined with the explicit concentration on accountability for the offense and community protection in order to "attack the juvenile criminal problem" directly parallel the considerations behind the criminal code. *See* Report at i.

¶ 100. Ironically, the majority opinion concedes that the purposes of the JJC express a more balanced approach to juvenile justice. However, the majority inexplicably fails to acknowledge the import of the provisions quoted above—that they demonstrate a shift from the parens patriae philosophy of former juvenile codes to a focus more in alignment with the criminal code. Instead, the majority focuses primarily upon

910

those provisions which promote rehabilitation and fails to discuss the similarity with the criminal code.

¶ 101. The majority also seems to suggest that because Wisconsin was formerly only one of a few states which offered juvenile delinquents the option of a jury trial, the majority's conclusion is inevitable. However, juveniles found delinquent in the other 49 states in the Union and the District of Columbia are not subject to the provisions of the JJC. Thus, other jurisdictions' juvenile laws are irrelevant for purposes of the court's inquiry under art. I, § 7.

¶ 102. Having considered the expressed purposes behind the JJC, I turn then to an examination of the substantive provisions of the new juvenile code. Accordingly, I examine the dispositions and potential long-term consequences of a delinquency adjudication to determine if the JJC "acts" criminal.

¶ 103. Wisconsin Stat. § 938.34 provides juvenile courts with several diverse dispositional options. Based on the court's evaluation of the seriousness of the act for which the juvenile is delinquent, the court may order participation in activities ranging from counseling to community service. *See* Wis. Stat. § 938.34. In addition, the circuit court may order the juvenile placed in, among others, a foster home, a "secure detention facility or juvenile portion of a county jail," a "secured correctional facility," or the Serious Juvenile Offender Program administered by the Department of Corrections (the Department). *See* Wis. Stat. § 938.34. Many of these dispositions parallel those available to adult courts in sentencing. *See, e.g.,* Wis. Stat. § 973.03–.20.[7]

---

[7] The majority cites at length to other tools available to the juvenile courts when considering a delinquency petition. These tools have parallels in the adult criminal code as well. Thus,

¶ 104. Of particular concern is the ability of a juvenile court to place a juvenile in secure confinement. For instance, pursuant to Wis. Stat. § 938.34(4m), a juvenile who commits an act for which an adult may spend six months or more in jail may be confined to a secured correctional facility for a two-year period, thereafter renewable on an annual basis up to age 18, so long as the court determines that the juvenile is a "danger to the public and in need of restrictive custodial treatment." Wis. Stat. §§ 938.34(4m)(b) & 938.355(4)(b).[8] Thus, for committing a crime for which an adult may only spend six months incarcerated, a juvenile may actually spend up to eight years in a secured correctional facility. *See* Wis. Stat. §§ 938.50, 938.355(4)(a), 938.365.

¶ 105. Another of the dispositional alternatives available to a juvenile court is placement of a youthful offender in the SJOP. *See* Wis. Stat. §§ 938.34(4h), 938.355(4)(b) and 938.538. Under this program, juveniles as young as 14 who commit any of a series of serious crimes[9] can be placed with the Department.

their existence does nothing to lessen the conclusion that the JJC is effectively a criminal code for juveniles.

[8] A prima facie showing of public danger is made if the juvenile commits one of 25 listed felonies, or if the juvenile possesses, uses, or threatens others with a firearm. *See* Wis. Stat. § 938.34(4m). In addition, juveniles can be found to be a public danger if the juvenile presents a threat to the property of another. *See B.M. v. State*, 101 Wis. 2d 12, 303 N.W.2d 601 (1981)("*In Interest of B.M.*").

[9] Fourteen-year-old offenders who violate Wis. Stat. §§ 939.31 (Conspiracy), 939.32(1)(a) (Attempt to commit crime carrying life imprisonment), 940.03 (Felony murder), 940.21 (Mayhem), 940.225(1) (First-degree sexual assault), 940.305 (Taking hostages), 940.31 (Kidnapping), 941.327(2)(b)4 (Tampering with household products and causing death of another),

Similarly, those children ages 10 and above who are adjudged delinquent for violating Wis. Stat. §§ 940.01 (First-degree intentional homicide), 940.02 (First-degree reckless homicide), or 940.05 (Second-degree intentional homicide) can also be subject to the SJOP placement options. *See* Wis. Stat. § 938.34(4h)(a).

¶ 106. Once a dispositional order under Wis. Stat. § 938.34(4h) is applied to a juvenile, the Department is free to enforce a program of "[s]upervision, care and rehabilitation that is more restrictive than ordinary supervision," and may include utilization of components ranging from electronic monitoring to outpatient treatment to placement in a Type 1 secured correctional facility with transfer to an adult prison. *See* Wis. Stat. § 938.538(2)(a), (3). In cases of secure confinement, the duration and location of that confinement is dependent upon the age of the juvenile and the seriousness of the crime committed. *See* Wis. Stat. § 938.538(3)(a)1.–1m.

¶ 107. If the juvenile commits an act which would be a Class A felony, the dispositional order must apply until age 25 and the juvenile must be placed in a Type 1 secured correctional facility (if over 11), a secured child caring facility (if under 12) or an adult

943.02 (Arson of buildings; damage of property by explosives), 943.10(2) (Burglary), 943.23(1g),(1m) or (1r) (Armed carjacking; Armed carjacking causing great bodily harm; and Armed carjacking leading to death of another), 943.32(2) (Robbery by use or threat of use of a dangerous weapon), 948.02(1) (First-degree sexual assault of a child), 948.025 (Engaging in repeated acts of sexual assault of the same child), 948.30(2) (Abduction of another's child), 948.35(1)(b) (Solicitation of a child to commit a Class A felony), or 948.36 (Use of a child to commit a Class A felony) are potential candidates for the Serious Juvenile Offender Program.

prison (if over 17). *See* Wis. Stat. § 938.538(3)(a)1. For adult Class B felonies, the order must last at least five years, but the Department may utilize nonsecure placement at its discretion. *See* Wis. Stat. § 938.34(4h)(a). As long as the youthful offender is subject to the Department, the Department may cycle juveniles through various restrictive and nonrestrictive placements at will. *See* Wis. Stat. § 938.538(3)(b).

¶ 108. More importantly, I also note that a subsequent amendment to the JJC now allows the Department to freely transfer juveniles as young as 15 years old to an adult prison facility. The Department can take this action without prior hearing. Wisconsin Stat. § 938.357(4)(d)(1997–98) provides in pertinent part:

> The department may transfer a juvenile who is placed in a Type 1 secured correctional facility to the Racine youthful offender correctional ["RYOC"] facility named in s. 302.01[10] if the juvenile is 15 years of age or over and the office of juvenile offender review in the department has determined that the conduct of the juvenile in the Type 1 secured correctional facility presents a serious problem to the juvenile or others.[11]

¶ 109. Consequently, a 10-year-old who commits what would be an adult Class A felony will be subject to the Department until age 25 and may spend at least 10 years of that placement in an adult prison. *See* Wis.

---

[10] When Wis. Stat. § 938.357(4)(d)(1997–98) was enacted, Wis. Stat. § 302.01 was amended to include the medium security penitentiary in Racine. *See* 1997 Wis. Act 27, § 3879m.

[11] Pursuant to Wis. Stat. § 302.01, the Racine Youthful Offender Correctional facility is defined as "[t]he medium security penitentiary at Racine."

Stat. §§ 938.34(4m); 938.50; 938.357(4)(b)1; 938.357(4)(d)(1997–98). Additionally, not only may the most serious juvenile offenders initially placed at Type 1 secured correctional facilities be transferred to the adult prison at Racine, it appears that juveniles committing less serious crimes initially placed at a Type 2 facility pursuant to Wis. Stat. § 938.34(4m) may also be transferred to a Type 1 facility,[12] and from there to adult prison under Wis. Stat. § 938.357(4)(d)(1997–98).

¶ 110. Finally, I also find significant the fact that the parallels between the JJC and the criminal code do not end with the placement of the new JJC next to the criminal code, the modified balanced approach of the new JJC, and the potential custodial disposition. The JJC also makes many juvenile offenders subject to several post-adjudication continuing sanctions that are imposed on adults convicted of committing the same acts.

¶ 111. Like adult felons, juveniles found delinquent for acts which would constitute a felony are subject to a lifetime ban on the possession of a firearm. *See* Wis. Stat. §§ 938.341, 941.29(1)(bm).[13] Like adult

---

[12] Wisconsin Stat. § 938.357(4)(b)1 provides:

> If a juvenile whom the department has placed in a Type 2 secured correctional facility. . .violates a condition of his or her placement in the Type 2 secured correctional facility, the child welfare agency. . .shall notify the department and the department. . .may place the juvenile in a Type 1 secured correctional facility under the supervision of the department without a hearing. . . .

Accordingly, juveniles who are not serious offenders under the dictates of Wis. Stat. § 938.538 may be transferred to Type 1 facilities and from there, pursuant to Wis. Stat. § 938.357(4)(b)1, to the adult facility at Racine.

[13] The majority dismisses this concern by noting that the sanction may ultimately be removed. I find this distinction meritless. To have the sanction that was previously imposed

convicts, who can be impeached at subsequent court proceedings by their prior criminal convictions, juvenile offenders can be impeached through the introduction of their delinquency adjudications. *See* Wis. Stat. §§ 938.35(1)(cm), 906.09.[14] Like adult convicts, the juvenile delinquency adjudication can be used against the juvenile for sentencing purposes in subsequent criminal proceedings. *See* Wis. Stat. § 938.35(1)(a).[15] Like adult convicts, in the event a juvenile commits a sex-related offense, the juvenile can be required to register as a sexual offender for 15 years. *See* §§ 301.45, 938.34(15m).[16] Like adult convicts, that

---

removed, the juvenile must initiate an action to prove that the juvenile is not likely to act contrary to the public safety in the future. The juvenile must prove this absence of any proclivity to commit a bad act in the future (a difficult proposition for even the most zealous of advocates) by the preponderance of the evidence. Thus, while an escape clause exists, it is one whose existence belies its effective use.

[14] The majority's resort to Wis. Stat. § 901.04 to dismiss this continuing sanction is unpersuasive since § 901.04 also applies to use of prior criminal convictions against adult offenders.

[15] The majority asserts that this sanction deserves no weight since the adjudication can only be used for the purpose of preparing the presentence investigation report. The majority fails, however, to acknowledge the use of that report and its internal references to the juvenile adjudication.

[16] The majority responds to this continuing sanction by emphasizing that courts retain the discretion, upon subsequent petition of a juvenile delinquent, to waive the reporting requirement in some cases. From this limited waiver provision, which I note expressly applies only where the goal of "public protection" is still vindicated, the majority concludes that "this is not criminal punishment and does not equate the JJC to a criminal code." Majority op. at 881–82. The majority's conclusion does not follow from its premise. The reporting requirement continues to

same juvenile can also be required to provide DNA samples to law enforcement. *See* Wis. Stat. §§ 938.34(15), 165.77.[17] Thus, as it was expressed at oral argument, these continuing sanctions "look[ ], talk[ ], [and] smell like adult criminal code, criminal consequences."

¶ 112. However, the State disagreed that the parallel nature of these same "very serious consequences" for antisocial behavior adds to the need for a jury trial in delinquency proceedings. The State's justification for this position is that the continuing sanctions do not arise as part of a criminal conviction. As the State indicated, "an individual goes through life having been adjudicated delinquent, but not having been found guilty of a felony." As discussed above, however, that distinction is now a matter more of form than of substance. Thus, while the continuing sanctions listed above may arise in a delinquency adjudication and not a criminal sanction, the effective distinction, from the point of view of the juvenile and of society, is negligible. The juvenile sex offender must inform his community of his prior bad acts just like the adult sex offender.

¶ 113. The majority expends significant energy attempting to justify its result in the face of a juvenile's potential long-term confinement under Wis. Stat. ch. 980, the sexual predator statute. Because ch. 980 is not part of the JJC, I do not believe that the sexual

---

apply to all juveniles pending a waiver. Even in the event a particular reporting requirement is waived, as to the group of remaining juveniles, the public safety, deterrence and punishment aspects of the reporting requirement are apparent. Thus, the requirement, even as modified, continues to show the criminal nature of the juvenile code.

[17] The majority fails to mention this continuing sanction.

predator statute is dispositive in one direction or the other of the art. I, § 7 inquiry.

¶ 114. However, the juveniles in this case also challenge the JJC on equal protection grounds. The majority never adequately addresses their argument. The majority fails to acknowledge that a "sexually violent person" is defined as "a person who has been convicted of a sexually violent offense [with the option of a jury trial], has been adjudicated delinquent for a sexually violent offense [no option of a jury trial], or has been found not guilty of or not responsible for a sexually violent offense by reason of insanity of mental disease, defect or illness [also with an option of a jury trial]." The majority fails to identify a rational basis on which to rest its distinction between adults who become subject to ch. 980 confinement proceedings after a jury trial and juveniles who become subject to ch. 980 without the protections of a jury trial, because there is no such basis. The legislature's search for a way to deal with juvenile crime leaves juveniles subject to a ch. 980 proceeding with potential indefinite commitment and without the right to a predicate jury finding of guilt or innocence to which adults are entitled.

¶ 115. The majority's response, that in order for a child adjudged delinquent to be committed under Wis. Stat. ch. 980 that child must also be dangerous due to a mental disorder, serves only as a smoke and mirrors attempt to avoid the real issue. Adult convicts, those committed under the NGI, and juveniles adjudged delinquent all must be dangerous due to a mental disorder and likely to commit sexual violence. Yet, of these three classes of individuals, it is only the juvenile adjudged delinquent that becomes subject to a ch. 980 petition without the benefit of a jury trial.

¶ 116. As demonstrated above, Wisconsin's juvenile code has dramatically shifted its focus. It has moved from providing paternalistic guidance to misguided youths to a broader balance of holding youthful offenders accountable for their criminal actions, protecting the public from juvenile crime, and making the offenders more productive members of society. This change and the tools used to implement that change lead me to conclude that the JJC is a criminal code in purpose and effect and cannot be deemed a civil code designed solely to rehabilitate the juvenile.

¶ 117. I conclude where the Juvenile Justice Study Committee began. The first sentence of the Study Committee's report states: "[t]he accompanying recommendations will significantly change the way Wisconsin treats young lawbreakers." I agree.

¶ 118. The majority of this court requires that juveniles suffer the consequences of criminal convictions but withhold conferring the same protections as given to adults. The "significant change" has resulted in a code that is criminal in nature. We must either restore the juvenile court's primary rehabilitative approach or restore the constitutional right of juveniles to trial by jury. Constitutionally, the court cannot have it both ways.

¶ 119. Because the newly enacted JJC in purpose and effect is criminal in nature, it is subject to art. I, § 7 of the Wisconsin constitution. I would declare the denial of a right to a jury trial in juvenile delinquency adjudications pursuant to Wis. Stat. § 938.31(2) unconstitutional on its face. Accordingly, I dissent.

¶ 120. I am authorized to state that Chief Justice Shirley S. Abrahamson and Justice Janine P. Geske join this opinion.